MELLOY, Circuit Judge,
with whom RILEY, Chief Judge, and SHEPHERD, Circuit Judge, join, dissenting.
I would hold that Moechnig’s decision in this case is not the type of decision Congress intended to shield from suit. Decisions are not shielded from suit merely because it is possible to identify policy issues behind the government program at issue. Rather, there must be “real and competing policy considerations implicated,” C.R.S. ex rel. D.B.S. v. United States, 11 F.3d 791, 802 (8th Cir.1993), at the general level of decisionmaking challenged in the lawsuit. This “is what separates” protected from unprotected conduct. Id. It is our task to carefully distinguish those cases involving meaningful policy considerations from cases like this, that bear only the superficial trappings of such considerations.
The majority identifies potential policy considerations that lie behind EQIP, and concludes that government technical specialists administering EQIP — employees such as Moechnig — generally are permitted and required to make decisions based upon “competing policy considerations.” The majority states, “A federal employee implementing EQIP at the local, operational level must have the discretion to balance environmental protection and cattle production in order for the program to be worth the government’s significant investment.” Ante at 1050. I simply disagree that such discretion can be characterized as addressing real and competing *1052 policy considerations in a meaningful sense. Such an employee does not enjoy the discretion to treat these dual goals as inconsistent and champion one over the other. Such an employee must, as a matter of technical expertise and based upon prevailing site conditions, “promote agricultural production ... and environmental quality as compatible goals.” 16 U.S.C. § 3839aa. I find no support for the proposition that a technical specialist such as Moechnig is empowered by statute, regulation, or Code 512 to step outside his role as a scientist, take on the mantle of policymaker, and choose one of these goals over the other. See Berkovitz v. United States, 486 U.S. 531, 537, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988) (“[T]he discretionary function exception insulates the Government from liability if the action challenged in the case involves the permissible exercise of policy judgment.” (emphasis added)).
To the extent the majority views this case as involving a competing dichotomy— alfalfa for cattle as allegedly proposed by the Herdens versus Moechnig’s selected seed mix (allegedly unfit for cattle) — the majority errs in three separate ways. First, it impermissibly focuses upon Moechnig’s actual and specific decision in this case. In applying the second step of the discretionary-function analysis, however, we are to ask only if the challenged action permitted the exercise of discretion and whether it was the type of governmental action that is susceptible to policy analysis. We are not to examine the actual choice that was made and infer from that particular choice that policy questions were in play. 28 U.S.C. § 2680(a) (stating that the United States may not be sued based upon the “exercise or performance or the failure to exercise or perform a discretionary function ..., whether or not the discretion involved be abused”); Demery v. U.S. Dep’t of Interior, 357 F.3d 830, 833 (8th Cir.2004) (“The judgment or decision need only be susceptible to policy analysis, regardless of whether social, economic, or political policy was ever actually taken into account, for the exception to be triggered.”); C.R.S., 11 F.3d at 798 (“Defendant could have considered a wide range of policy factors in making its decision; whether or not it actually did so is immaterial....”).
Second, to the extent it was appropriate to examine Moechnig’s actual decision at all, the majority’s description of the decision is incorrect. Here, the record is clear: Moechnig did not select his recommended seed mixture and reject the Her-dens’ request for alfalfa to champion environmental concerns over forage needs. He rejected alfalfa as a planting option for the pasture in Section 11 because he did not believe alfalfa was appropriate for the site. In his technical estimation, alfalfa was not likely to thrive in that pasture’s saturated soil. Also, in his technical estimation and professional judgment, a high seed application rate for the other species was required to compensate for these difficult growing conditions. Further, Moechnig’s recommended seed mixture cannot reasonably be viewed as inherently incompatible with cattle forage needs when viewed in the appropriate context, i.e., as part of a larger cattle operation involving several different pastures with different characteristics and different plant species. This independent fact proves the falseness of the dichotomy at the heart of the majority’s opinion. The fighting issues in this case, were a court to permit it to go to trial, would be issues of causation: did Moechnig’s seed selection cause the damage to the Herdens’ cattle; did the Her-dens improperly harvest and store wet grasses and legumes from Section 11, thus by their own hands independently causing the development of dangerous molds or other toxins; did the Herdens unwisely permit their cattle to graze too long or too *1053 exclusively on a field of alsike clover when other, less-alsike-intensive pastures were available; or, even assuming there were no mold or other storage-related infirmities with feed from Section 11, did the Herdens simply err by unwisely and exclusively feeding a heavy alsike clover mixture to the cattle when the harvested products of Section 11 could have been blended with other stored feed? These potential and serious jury questions as to causation make clear the majority’s error in examining Moechnig’s actual decision and interpreting it as based on a false dichotomy pitting cattle needs against environmental needs.
Third, the cases show that in almost all situations, it is possible to look at a government actor’s decisionmaking task and find some element of “social, economic, or political policy,” Demery, 357 F.3d at 833, lurking in the background. It remains important to acknowledge this fact so as to not oversimplify our characterizations of decisions and also to guard against interpreting the mere presence of such issues as showing that they are real and competing in a material sense. In my view, the majority makes this mistake.
In Lather v. Beadle County, 879 F.2d 365, 368 (8th Cir.1989), cited by the majority, we found the discretionary-function exception did not apply to decisions of a government physician providing patient treatment. The majority describes the government actor in Lather as “advancing a singular goal, i.e., providing appropriate medical care to a patient.” Ante at 1051. In setting forth this description, the majority fails to acknowledge the complex considerations inherent in the provision of medical care. Behind every individual medical treatment recommendation is a technical medical diagnosis coupled with a calculus that balances the cost-effectiveness of tests, procedures, and medications against the individual patient’s wellness goals, the ethical strictures of the profession and society, and larger public-health concerns. For example, the age-related use of PSA tests (with their many false positives) or the overuse of antibiotics are matters of substantial societal concern that, in any individual case, may have grave implications for an individual patient. Nevertheless, the presence of social, economic, and political concerns inherent in medical decisions are not sufficiently “real and competing” in the context of individual patient treatment to trigger application of the discretionary-function exception under the FTCA. I therefore disagree with the majority’s attempt to distinguish the present case from Lather by characterizing the physician as a government actor with a “singular goal.” Rather, Lather demonstrates the need for our court to openly acknowledge that few if any decisions are made in the pursuit of a singular goal and that social, economic, and political policy considerations can be identified behind most decisions. It remains our task to sort the wheat from the chaff and determine, in each case, whether any such policy issues are “real and competing” in any meaningful way.
In reaching my conclusion that the discretionary-function exception should not apply in this case, I recognize the rebuttable presumption that arises in favor of its application when a court concludes that some degree of discretion exists. United States v. Gaubert, 499 U.S. 315, 324, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991) (“When established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent’s acts are grounded in policy when exercising that discretion.”). I also reject categorical treatment, *1054 as urged by the Herdens in this case, that would draw bright lines between “operational” and “planning” decisions, site-specific and generally applicable decisions, cost-related and non-cost-related decisions, or even technical/professional and layperson decisions. See Id. at 325-26, 111 S.Ct. 1267 (rejecting categorical treatments such as “operational” versus “planning” and stating, “ ‘it is the nature of the conduct, rather than the status of the actor’ that governs whether the discretionary function exception applies” (quoting United States v. Varig Airlines, 467 U.S. 797, 813, 104 S.Ct.' 2755, 81 L.Edüd 660 (1984))). Still, our rejection of categorical treatment cannot lead us to ignore the need to distinguish between those cases where policy concerns are substantial and important factors at the level of decisionmaking involved in a case and those cases where such concerns are merely background noise. Here, I am left with the firm impression that Moechnig’s limited authority did not extend to the type of discretion Congress intended to shield from suit. Accordingly, I dissent.