# United States Court of Appeals
## For the Eighth Circuit

_____

No. 11-3530

_____

Greg Herden; Roger Herden; Garrett Herden

*Plaintiffs - Appellants*

v.

United States of America

*Defendant - Appellee*

_____

Appeal from United States District Court
for the District of Minnesota - Minneapolis

_____

Submitted: April 12, 2013
Filed: August 9, 2013

_____

Before RILEY, Chief Judge, WOLLMAN, LOKEN, MURPHY, BYE, MELLOY, SMITH, COLLOTON, GRUENDER, BENTON, and SHEPHERD, Circuit Judges, En Banc.

_____

BYE, Circuit Judge, with whom WOLLMAN, LOKEN, MURPHY, SMITH, COLLOTON, GRUENDER, and BENTON, Circuit Judges, join, concurring.

Greg Herden, Roger Herden, and Garrett Herden (the Herdens) sued the United States under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346, 2671-80. They alleged their cattle operation suffered damage because of a seed mixture an

employee of the United States Department of Agriculture (USDA) directed them to plant on their land. The district court[1] dismissed the Herdens' claims, concluding the federal employee's conduct fell within the FTCA's discretionary-function exception. After a divided panel of this court reversed the district court, the en banc court granted the government's petition for rehearing. We now affirm the district court.

I

The Herdens operate a three-generation[2] cattle farm in northern Minnesota. In May 2004, the Herdens chose to participate in the Environmental Quality Incentives Program (EQIP). EQIP is a program run by the USDA through the Natural Resource Conservation Service (NRCS). "The purpose of EQIP is to promote agriculture production, forestry management, and environmental quality as compatible goals, and to optimize environmental benefits." Megan Stubbs, Cong. Research Serv., R40197, Environmental Quality Incentives Program (EQIP): Status and Issues 1 (2009); see also 16 U.S.C. § 3839aa (reciting the purposes of EQIP). Through EQIP, the government provides financial and technical assistance to farmers and ranchers. In exchange, farmers and ranchers who choose to participate in EQIP implement conservation measures "to address soil, water, air, and related natural resources concerns . . . on their lands in an environmentally beneficial and cost-effective manner." 7 C.F.R. § 1466.1 (2004). In this case, the Herdens agreed to plant a mix of grasses and legumes on some of their pasture lands, and the government agreed to reimburse the Herdens 90% of the costs associated with planting the seed mixture chosen by the NRCS.

---

[1]The Honorable John R. Tunheim, United States District Judge for the District of Minnesota.

[2]Roger Herden is Greg Herden's father. Greg Herden is Garrett Herden's father.

Because environmental conditions vary widely across the United States, the specific conservation practices approved through EQIP must be determined locally. See 68 Fed. Reg. at 32,341 (2003) ("A basic element of EQIP implementation . . . is the use of the locally-led process to adapt EQIP to local conditions."). As a result, the NRCS's State Conservationist chooses local employees who will administer the program at specific sites. See 7 C.F.R. § 1466.6 (2004). In Minnesota, William Hunt served as the NRCS's State Conservationist. Hunt delegated seed mixture planting decisions to his staff, including State Grazing Specialist Howard Moechnig. Moechnig was the particular staff member who visited the Herdens' ranch to select a seed mixture.

Moechnig visited the Herdens' operation in the fall of 2004, including a pasture referred to as Section 11. Moechnig observed particularly wet conditions in Section 11. Because of the saturated soil, Moechnig chose a seed mixture with a high amount of Alsike Clover for the Herdens to plant in the pasture. Specifically, Moechnig recommended a mixture comprised of six pounds of Alsike Clover, four pounds of Timothy grass, and three pounds of Garrison Creeping Foxtail grass. Altogether the seed mixture averaged 271 seeds per square foot. Moechnig explained he chose that particular seed mixture for several reasons, including the following: (1) to establish good ground cover; (2) to enhance soil quality; (3) to enhance ground and surface water quality; (4) to prevent erosion; (5) to create wildlife habitat; and (6) to provide good forage. See App. at 37. In addition, Moechnig believed the seed mixture he chose "would continue to provide good vegetation for many years, so cost-sharing it through EQIP was a good investment for NRCS." Id.

Federal regulations require that "[a]ll conservation practices in the EQIP plan of operations must be carried out in accordance with the applicable NRCS field office technical guide." 7 C.F.R. § 1466.9 (2004). When choosing the seed mixture for the Herdens' land, Moechnig referred to Code 512 of the Minnesota Field Office

-3-

Technical Guide (FOTG).[3]  Under a heading entitled "Species Selection," Code 512 says seed "[m]ixtures will have a recommended seeding rate of 50-70 seeds per square foot."  Although the 271 seeds per square foot Moechnig chose for the Herdens' land exceeded this recommended seeding rate, another provision of Code 512 (Table 2 entitled "Mixtures Recommended in Minnesota") specified that "[o]ther mixtures may be used."  In fact, Table 2 listed several mixtures that exceeded the recommended seeding rate of 50-70 seeds per square foot.

Similarly, Table 1 entitled "Seeding Rates" allowed for several mixtures that exceeded the recommended seeding rate of 50-70 seeds per square foot.[4]  For example, when Alsike Clover is planted alone and not in a mixture, Table 1 recommends planting 3.5 million seeds per acre, which converts to over 80 seeds per square foot.  Likewise, the "in mixture" recommendations under Table 1 for Alsike Clover (1.4 million seeds per acre) and Timothy grass (3.69 million seeds per acre) convert to 117 seeds per square foot without including Creeping Foxtail grass.

After Moechnig chose the seed mixture for the pasture in Section 11, Greg Herden said he complained to Moechnig about the high amount of Alsike Clover in the mixture because the clover can create toxic hay for cattle.  Moechnig does not recall Herden complaining about Alsike Clover toxicity, but does remember Herden asking for permission to plant a mix containing alfalfa.  Moechnig denied permission to plant an alfalfa mix, explaining that alfalfa is hard to establish on wet soils and therefore would neither meet NRCS's environmental goals nor be a good investment for the government.  The Herdens chose to comply with Moechnig's seed mixture

_____

[3]Coincidentally, Moechnig himself authored Code 512 of the FOTG.

[4]Table 1 lists the number of pounds of seed recommended per acre for various grasses and legumes, as well as the number of seeds in each pound.  The pounds of seeds per acre multiplied by the amount of seeds per pound converts to seeds per square foot by dividing the result by 43,560, the number of square feet in an acre.

decision because failure to do so would have resulted in losing the federal funding under EQIP.

After planting the seed mixture in the Section 11 pasture, the Herdens allowed cattle to graze the pasture. They also harvested hay from the pasture and stored it. They later fed the stored hay to their cattle during the winter and spring of 2006-07. The Herdens claim toxic hay began to injure their cattle in the spring of 2007. Several calves were stillborn, and others died shortly after birth. Adult cattle also died. The Herdens attribute the illnesses and deaths of their cattle to the Alsike Clover in the hay harvested from the Section 11 pasture. They claim the losses to their cattle herd have virtually destroyed their multi-generational farming operation. The NRCS contests the Herdens' claims and instead believes mold in improperly stored hay caused the problems with the cattle herd.

In February 2010, the Herdens brought suit against the United States pursuant to the FTCA. They alleged Moechnig was negligent in advising them to plant a seed mixture with such a high amount of Alsike Clover, and his negligence caused injury to their cattle operation and family farm. The government moved to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). The government argued Moechnig's seed mixture selection was the type of policy-implementing decision for which the government is immune from suit under the FTCA's discretionary-function exception. The district court agreed Moechnig's decision was a discretionary one. The district court further determined Moechnig's decision involved the balancing of policy goals and considerations, making it the type of discretionary decision Congress intended to exempt from suit. The district court therefore granted the government's motion to dismiss. The Herdens filed a timely appeal.

II

When a district court dismisses a claim under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction, we review the dismissal de novo, "placing the burden of proving the existence of subject matter jurisdiction on the plaintiff." Green Acres Enters., Inc. v. United States, 418 F.3d 852, 856 (8th Cir. 2005). We may look outside the pleadings to determine the threshold question of jurisdiction. Id.

Pursuant to the FTCA, the federal government waives sovereign immunity and allows itself to be sued

> for injury or loss of property . . . caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1). This broad waiver does not, however, apply to claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). This exception is referred to as the discretionary function exception. See, e.g., Walters v. United States, 474 F.3d 1137, 1139 (8th Cir. 2007). "If the FTCA's discretionary function exception applies, it is a jurisdictional bar to suit." Id.

A well-established legal framework applies to determine whether the discretionary function exception bars a party's suit under the FTCA. The first inquiry is whether the challenged conduct or omission is truly discretionary, that is, whether it involves an element of judgment or choice instead of being "controlled by mandatory statutes or regulations." United States v. Gaubert, 499 U.S. 315, 328

(1991) (citing Berkovitz v. United States, 486 U.S. 531, 536 (1988)). If the challenged conduct is not discretionary, the exception does not apply.

If the challenged action is discretionary, however, the next inquiry is whether the government employee's judgment or choice was "based on considerations of social, economic, and political policy." Layton v. United States, 984 F.2d 1496, 1499 (8th Cir. 1993) (citing Berkovitz, 486 U.S. at 536-37). Not all discretionary decisions are immune from suit because the Congressional purpose of the exception is "to prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy[.]" United States v. Varig Airlines, 467 U.S. 797, 814 (1984). However, as long as a discretionary decision is "susceptible to policy analysis," Gaubert, 499 U.S. at 325, the exception applies "whether or not [a] defendant in fact engaged in conscious policy-balancing." C.R.S. ex rel. D.B.S. v. United States, 11 F.3d 791, 801 (8th Cir. 1993).

A

The Herdens first contend Moechnig's selection of a seed mixture for the Section 11 pasture was not a discretionary decision. More to the point, they argue Moechnig violated a mandatory and specific directive of the FOTG when he selected a seed mixture containing 271 seeds per square foot, because Code 512 says seed "[m]ixtures will have a recommended seeding rate of 50-70 seeds per square foot." See Burgin v. Nix, 899 F.2d 733, 735 (8th Cir. 1990) (per curiam) (recognizing the use of the word "will" in a prison policy was mandatory in nature).

We acknowledge a federal regulation clearly mandates that "[a]ll conservation practices in the EQIP plan of operations must be approved by NRCS and developed and carried out in accordance with the applicable NRCS technical guidance." 7 C.F.R. § 1466.9(a). In addition, the government does not dispute the "technical guidance" mentioned in § 1466.9(a) refers to the Minnesota FOTG, including Code

-7-

512.  We ultimately reject the Herdens' contention that Moechnig violated a mandatory and specific directive when he selected a seed mixture containing more than 50-70 seeds per square foot, however, because Code 512 itself does not *mandate* any particular seed mixtures.  Rather, our reading of the FOTG indicates Code 512 set forth technical guidelines for Moechnig to follow in the exercise of his discretion.

We reach this conclusion for two reasons.  First, although Code 512 states seed mixtures "will have" 50-70 seeds per square foot, other parts of Code 512 use permissive language which conflicts with this purportedly mandatory directive.  Notably, the phrase "50-70 seeds per square foot" is itself modified by the word "recommended."  Code 512 also states it "may be applied as part of a resource management system" and "[o]ther mixtures may be used."  See Dykstra v. Bureau of Prisons, 140 F.3d 791, 796 (8th Cir. 1998) (indicating "use of the term 'may' in . . . regulations imports discretion").  Overall, Code 512 uses predominantly permissive rather than mandatory language, a clear signal the seeding mixtures contained therein are merely guidelines rather than mandatory requirements.  See Riley v. United States, 486 F.3d 1030, 1033 (8th Cir. 2007) (concluding a uniform state highway standard which addressed sight angles at intersections was merely a guideline and not mandatory, despite the standard's use of the term "must," because the standard also used permissive terms such as "guidance" and "recommended").

Second, as noted above, many of the seeding mixtures listed in Tables 1 and 2 of Code 512 actually exceed the purported maximum of 70 seeds per square foot.  As a result, a State Grazing Specialist such as Moechnig could not, in many instances, comply with the seed mixtures contained in the tables as well as the recommended seeding rate of 50-70 seeds per square foot.  This supports the government's contention that the recommended seeding rate in Code 512 did not refer to the maximum amount of seeds to be planted per square foot, and was not intended as a mandatory range.  Consequently, we conclude Moechnig's selection of a seed mixture for the Section 11 pasture was a discretionary decision.

B

The Herdens further contend Moechnig's seed mixture selection, even if discretionary, was not the type of discretionary decision Congress intended to shield from suit because it is not susceptible to policy analysis. Because we have determined Moechnig's decision was a discretionary one, "it must be presumed that the agent's acts are grounded in policy when exercising that discretion." Gaubert, 499 U.S. at 324. "The [Herdens] must rebut this presumption." Demery v. United States Dep't of Interior, 357 F.3d 830, 833 (8th Cir. 2004).

In attempting to rebut the presumption that Moechnig's decision was grounded in policy, the Herdens argue the "decision was a mere professional judgment not imbued with the policy making character that the discretionary function exception was designed to shield from judicial second guessing." Appellant's Br. at 22. The Herdens further suggest the "scale of the decision must be considered" when determining whether a professional decision is susceptible to a policy analysis, and that Moechnig's seed mixture decision "was a professional judgment for one farm, not a decision of sufficient scale to be deemed a policy judgment." Id. at 21, 22.

In Gaubert, the Supreme Court addressed a similar claim involving operational level decisions undertaken by federal bank regulators in managing the day-to-day activities of a savings and loan association (SLA). The plaintiff argued the regulators' conduct fell outside the discretionary function exception because it "involved the mere application of technical skills and business expertise" at the operational level rather than at a policy-making level. 499 U.S. at 331. The Supreme Court rejected this argument, stating:

But this is just another way of saying that the considerations involving the day-to-day management of a business concern such as [the SLA] are so precisely formulated that decisions at the operational level never involve the exercise of discretion within the meaning of [the FTCA], a

-9-

notion that we have already rejected in disapproving the rationale of the Court of Appeals' decision. It may be that certain decisions resting on mathematical calculations, for example, involve no choice or judgment in carrying out the calculations, but the regulatory acts alleged here are not of that genre. Rather, it is plain to us that each of the challenged actions involved the exercise of choice and judgment.

Id.

"Discretionary conduct is not confined to the policy or planning level." Id. at 325. The fact that Moechnig's decision involved technical or professional judgment at the operational level is not enough to remove his decision from the protection of the discretionary function exception. See Layton, 984 F.2d at 1500 ("[T]he Supreme Court has repeatedly said that it is the nature of the conduct, rather than the status of the actor, that governs whether the discretionary function exception applies in a given case. . . . In other words, the fact that determinations are made at a relatively low level does not prevent the applicability of the exception.") (internal quotation marks and citation omitted). Thus, the relevant inquiry does not focus on whether Moechnig applied professional or technical judgment to make a decision about just one seed mixture in one pasture of one farm. Rather, the inquiry is whether the seed mixture decision was susceptible to a policy analysis because it was "based on considerations of social, economic, and political policy." Id. at 1499.

To decide that question, we do not start on a clean slate. Moechnig's selection of a seed mixture implemented the policies of the EQIP program, the purpose of which is "to address soil, water, air, and related natural resources concerns . . . in an environmentally beneficial and cost-effective manner." 7 C.F.R. § 1466.1 (2004). In another case involving environmental policy, we addressed whether the government's maintenance of an aeration system on a lake located within the Turtle Mountain Indian Reservation fell within the discretionary function exception. Demery, 357 F.3d at 832. We held "[t]he BIA's maintenance of the aeration system

clearly lends itself to policy analysis" because the "decision concerned protecting the environment and aquatic habitats, which are obvious issues of policy." Id. at 833.

Similarly, in Layton we addressed "decisions regarding the culling of timber . . . made at the local level" by Forest Service employees. 984 F.2d at 1500. One employee of a private contractor hired by the government to cull trees from the Ozark-St. Francis National Forest died and one employee of a second private contractor suffered injuries in separate felling accidents. They both alleged their injuries were caused in part by the negligence of Forest Service employees in selecting the individual trees to be felled. We held the selection of specific trees to be culled – a decision based on the professional judgment of federal timber markers – fell within the discretionary function exception because the "decisions made by Forest Service personnel were independent choices grounded in policy." Id. at 1502. The policy we identified was the "Forest Service's policy of improving timber quality." Id.

The six reasons Moechnig gave for his seed mixture decision (to establish good ground cover, to enhance soil quality, to enhance ground and surface water quality, to prevent erosion, to create wildlife habitat, and to provide good forage) were all based on considerations of environmental policies the EQIP program was meant to advance.[5]  Consequently, we see no meaningful distinction between the decisions

_____

[5]The dissent contends we impermissibly focus upon Moechnig's actual and specific decision.  The dissent claims the actual decision is irrelevant because a challenged decision need only be *susceptible* to policy analysis for the discretionary function exception to apply. We disagree to being limited to an abstract consideration of any particular decision.  Although a decision maker need not actually consider social, economic, or political policy to trigger the exception, it is nonetheless relevant when a decision maker actually does consider policy factors before making a decision. Indeed, the fact a decision maker actually takes policy factors into account is one way to demonstrate a decision is susceptible to policy analysis. Furthermore, the question whether a particular decision maker actually considered policy factors,

-11-

involved in <u>Demery</u> and <u>Layton</u> and the seed mixture decision involved here. In all three cases, federal employees exercised professional judgment at the operational level to advance an environmental policy of the federal government.

We have also recognized one of the earmarks of a decision susceptible to policy analysis is one in which a federal employee must weigh or balance competing interests. See <u>Chantal v. United States</u>, 104 F.3d 207, 212 (8th Cir. 1997) ("It is well established that a decision which requires the weighing of competing interests is 'susceptible to policy analysis' and typifies the kind of governmental decisions which Congress intended to shield from judicial second-guessing." (quoting <u>Gaubert</u>, 499 U.S. at 325)).

In this case, Moechnig was charged with balancing a number of competing interests. Code 512 required him to choose a seed mixture "as part of a resource management system to accomplish one or more" of six listed purposes:

- Establish adapted and compatible species, varieties, or cultivars.
- Improve or maintain livestock nutrition and/or health.
- Extend the length of the grazing season.
- Provide emergency forage production.
- Reduce soil erosion by wind and/or water.
- Improve or renovate species growing on pasture or hayland.

---

or at least *could have* considered them, is a completely separate inquiry from the question whether the decision maker ultimately abused his discretion. Thus, the dissent's citation to 28 U.S.C. § 2680(a) (stating the United States may not be sued based upon a discretionary function "whether or not the discretion involved be abused") does nothing to advance the claim to the effect we cannot examine whether Moechnig actually considered environmental policies prior to making his decision.

In addition, two of the statutory purposes of EQIP are to "promote agricultural production . . . and environmental quality as compatible goals."  16 U.S.C. § 3839aa. As the facts of this case aptly demonstrate, the six purposes listed in Code 512 – as well as the statutory purposes of agricultural production and environmental quality – can sometimes be competing interests even though the NRCS is charged with the task of making them compatible.

On one hand, the Herdens believed a seed mixture containing alfalfa would have better advanced the statutory goal of agricultural production, as well as one of Code 512's stated purposes of improving or maintaining livestock nutrition and/or health.  On the other hand, Moechnig believed a seed mixture containing Alsike Clover would better advance the statutory goal of environmental quality, and at least one of Code 512's stated purposes of reducing soil erosion by wind and/or water.  The fact that Moechnig was required to balance those competing interests in order "to optimize environmental benefits," 16 U.S.C. § 3839aa, clearly demonstrates the decision he ultimately made was susceptible to policy analysis and thus the type of decision Congress meant to shield from judicial second-guessing.  A federal employee implementing EQIP at the local, operational level must have the discretion to balance environmental protection and cattle production in order for the program to be worth the government's significant investment.

Moechnig's need to balance competing interests is what primarily distinguishes this case from others where decisions involving the exercise of professional judgment *did not* fall within the protection of the discretionary function exception.  See C.R.S., 11 F.3d at 802 ("The issue . . . whether there are real and competing policy considerations implicated is what separates" protected discretionary decisions from unprotected ones.); Layton, 984 F.2d at 1505 (basing its distinction between protected discretionary decisions and unprotected ones on whether a "consideration of competing values was implicated in the government's decision").

For example, in Lather v. Beadle County, 879 F.2d 365 (8th Cir. 1989), we addressed the provision of medical care by a government physician, more specifically, the treatment provided by a psychologist employed by the National Health Services Corporation in Huron, South Dakota. The basketball coach for Huron College sought treatment from the psychologist for depression. The government psychologist, in consultation with a psychiatrist, prescribed medication to treat the depression. The depression worsened, however, and ultimately the coach suffered serious injuries when he jumped from a moving vehicle while being transported by deputy sheriffs to the Human Services Center in Yankton after voluntarily committing himself. Following the injuries, the coach sued the government psychologist alleging he was negligent in his evaluation of the coach's medical condition and in failing to advise the deputy sheriffs to use restraints during the coach's transportation between Huron and Yankton. Id. at 366-68. We held the physician's provision of medical care did not fall within the discretionary function exception because it did not involve "governmental discretion," which we equated with the need to balance policy considerations. See id. at 368 (citing Georgia Cas. & Sur. Co. v. United States, 823 F.2d 260, 262 (8th Cir. 1987)).

In Lather, the government actor was advancing a singular goal, i.e., providing appropriate medical care to a patient. The government psychologist was not required to balance any competing policy considerations when he prescribed depression medication, or when he failed to instruct the deputy sheriffs to use restraints. In sharp contrast, Moechnig's job required him to balance protecting the environment with providing nutritious cattle forage, while at the same time being cognizant of the cost to the Herdens and the federal government. We therefore conclude this case involves the type of discretionary decision Congress meant to shield from judicial second-guessing.

-14-

III

We affirm the district court.

MELLOY, Circuit Judge, with whom RILEY, Chief Judge, and SHEPHERD, Circuit Judge, join, dissenting.

I would hold that Moechnig's decision in this case is not the type of decision Congress intended to shield from suit. Decisions are not shielded from suit merely because it is possible to identify policy issues behind the government program at issue. Rather, there must be "real and competing policy considerations implicated," C.R.S. *ex rel.* D.B.S. v. United States, 11 F.3d 791, 802 (8th Cir. 1993), at the general level of decisionmaking challenged in the lawsuit. This "is what separates" protected from unprotected conduct. Id. It is our task to carefully distinguish those cases involving meaningful policy considerations from cases like this, that bear only the superficial trappings of such considerations.

The majority identifies potential policy considerations that lie behind EQIP, and concludes that government technical specialists administering EQIP—employees such as Moechnig—generally are permitted and required to make decisions based upon "competing policy considerations." The majority states, "A federal employee implementing EQIP at the local, operational level must have the discretion to balance environmental protection and cattle production in order for the program to be worth the government's significant investment." Ante at 13. I simply disagree that such discretion can be characterized as addressing real and competing policy considerations in a meaningful sense. Such an employee does not enjoy the discretion to treat these dual goals as inconsistent and champion one over the other. Such an employee must, as a matter of technical expertise and based upon prevailing site conditions, "promote agricultural production . . . and environmental quality as compatible goals." 16 U.S.C. § 3839aa. I find no support for the proposition that a

-15-

technical specialist such as Moechnig is empowered by statute, regulation, or Code 512 to step outside his role as a scientist, take on the mantle of policymaker, and choose one of these goals over the other. See Berkovitz v. United States, 486 U.S. 531, 537 (1988) ("[T]he discretionary function exception insulates the Government from liability if the action challenged in the case involves the *permissible* exercise of policy judgment." (emphasis added)).

To the extent the majority views this case as involving a competing dichotomy—alfalfa for cattle as allegedly proposed by the Herdens versus Moechnig's selected seed mix (allegedly unfit for cattle)—the majority errs in three separate ways. First, it impermissibly focuses upon Moechnig's actual and specific decision in this case. In applying the second step of the discretionary-function analysis, however, we are to ask only if the challenged action *permitted* the exercise of discretion and whether it was the *type* of governmental action that is susceptible to policy analysis. We are not to examine the actual choice that was made and infer from that particular choice that policy questions were in play. 28 U.S.C. § 2680(a) (stating that the United States may not be sued based upon the "exercise or performance or the failure to exercise or perform a discretionary function . . . , whether or not the discretion involved be abused"); Demery v. U.S. Dep't of Interior, 357 F.3d 830, 833 (8th Cir. 2004) ("The judgment or decision need only be susceptible to policy analysis, regardless of whether social, economic, or political policy was ever actually taken into account, for the exception to be triggered."); C.R.S., 11 F.3d at 798 ("Defendant could have considered a wide range of policy factors in making its decision; whether or not it actually did so is immaterial . . . .").

Second, to the extent it was appropriate to examine Moechnig's actual decision at all, the majority's description of the decision is incorrect. Here, the record is clear: Moechnig did not select his recommended seed mixture and reject the Herdens' request for alfalfa to champion environmental concerns over forage needs. He rejected alfalfa as a planting option for the pasture in Section 11 because he did not

believe alfalfa was appropriate for the site. In his technical estimation, alfalfa was not likely to thrive in that pasture's saturated soil. Also, in his technical estimation and professional judgment, a high seed application rate for the other species was required to compensate for these difficult growing conditions. Further, Moechnig's recommended seed mixture cannot reasonably be viewed as inherently incompatible with cattle forage needs when viewed in the appropriate context, i.e., as part of a larger cattle operation involving several different pastures with different characteristics and different plant species. This independent fact proves the falseness of the dichotomy at the heart of the majority's opinion. The fighting issues in this case, were a court to permit it to go to trial, would be issues of causation: did Moechnig's seed selection cause the damage to the Herdens' cattle; did the Herdens improperly harvest and store wet grasses and legumes from Section 11, thus by their own hands independently causing the development of dangerous molds or other toxins; did the Herdens unwisely permit their cattle to graze too long or too exclusively on a field of alsike clover when other, less-alsike-intensive pastures were available; or, even assuming there were no mold or other storage-related infirmities with feed from Section 11, did the Herdens simply err by unwisely and exclusively feeding a heavy alsike clover mixture to the cattle when the harvested products of Section 11 could have been blended with other stored feed? These potential and serious jury questions as to causation make clear the majority's error in examining Moechnig's actual decision and interpreting it as based on a false dichotomy pitting cattle needs against environmental needs.

Third, the cases show that in almost all situations, it is possible to look at a government actor's decisionmaking task and find some element of "social, economic, or political policy," Demery, 357 F.3d at 833, lurking in the background. It remains important to acknowledge this fact so as to not oversimplify our characterizations of decisions and also to guard against interpreting the mere presence of such issues as showing that they are real and competing in a material sense. In my view, the majority makes this mistake.

In Lather v. Beadle County, 879 F.2d 365, 368 (8th Cir. 1989), cited by the majority, we found the discretionary-function exception did not apply to decisions of a government physician providing patient treatment. The majority describes the government actor in Lather as "advancing a singular goal, i.e., providing appropriate medical care to a patient." Ante at 14. In setting forth this description, the majority fails to acknowledge the complex considerations inherent in the provision of medical care. Behind every individual medical treatment recommendation is a technical medical diagnosis coupled with a calculus that balances the cost-effectiveness of tests, procedures, and medications against the individual patient's wellness goals, the ethical strictures of the profession and society, and larger public-health concerns. For example, the age-related use of PSA tests (with their many false positives) or the overuse of antibiotics are matters of substantial societal concern that, in any individual case, may have grave implications for an individual patient. Nevertheless, the presence of social, economic, and political concerns inherent in medical decisions are not sufficiently "real and competing" in the context of individual patient treatment to trigger application of the discretionary-function exception under the FTCA. I therefore disagree with the majority's attempt to distinguish the present case from Lather by characterizing the physician as a government actor with a "singular goal." Rather, Lather demonstrates the need for our court to openly acknowledge that few if any decisions are made in the pursuit of a singular goal and that social, economic, and political policy considerations can be identified behind most decisions. It remains our task to sort the wheat from the chaff and determine, in each case, whether any such policy issues are "real and competing" in any meaningful way.

In reaching my conclusion that the discretionary-function exception should not apply in this case, I recognize the rebuttable presumption that arises in favor of its application when a court concludes that some degree of discretion exists. United States v. Gaubert, 499 U.S. 315, 324 (1991) ("When established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are

-18-

grounded in policy when exercising that discretion. ").  I also reject categorical treatment, as urged by the Herdens in this case, that would draw bright lines between "operational" and "planning" decisions, site-specific and generally applicable decisions, cost-related and non-cost-related decisions, or even technical/professional and layperson decisions.  See Id. at 325–26 (rejecting categorical treatments such as "operational" versus "planning" and stating, "'it is the nature of the conduct, rather than the status of the actor' that governs whether the discretionary function exception applies" (quoting United States v. Varig Airlines, 467 U.S. 797, 813 (1984))).  Still, our rejection of categorical treatment cannot lead us to ignore the need to distinguish between those cases where policy concerns are substantial and important factors at the level of decisionmaking involved in a case and those cases where such concerns are merely background noise.  Here, I am left with the firm impression that Moechnig's limited authority did not extend to the type of discretion Congress intended to shield from suit.  Accordingly, I dissent.

_____