# United States Court of Appeals
## For the Eighth Circuit

_____

No. 17-2567

_____

Ronald C. Buckler

*Plaintiff - Appellant*

v.

United States of America

*Defendant - Appellee*

_____

Appeal from United States District Court
for the Western District of Missouri - St. Joseph

_____

Submitted: April 11, 2018
Filed: March 22, 2019

_____

Before BENTON, MELLOY, and GRASZ, Circuit Judges.

_____

MELLOY, Circuit Judge.

Ronald C. Buckler was tragically injured at his place of work, a surface gravel mine. Mr. Buckler sued the United States of America under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b)(1). He argued his injuries were caused at least in part by a federal mine inspector's inadequate inspection of the mine. The district court held Missouri law contained no private-analogue duty from which FTCA

liability could arise. The district court held in the alternative that the discretionary-function exception to the FTCA's waiver of sovereign immunity applied. With one limited exception, we agree the discretionary-function exception applies, and we therefore affirm the judgment of the district court in most respects. We reverse only as to the claim that the mine inspector failed to carry out a non-discretionary and mandatory duty to review training records.

I.

Mr. Buckler was injured when using an impact-based rock crusher located at the mine. The crusher had a rotating element to throw rocks against a steel anvil. Upstream from this rotator, a vibrating loading chute moved rocks towards the rotator. The vibrating chute became jammed, and workers turned off the vibrator, but not the rotator. Mr. Buckler attempted to clear the chute by pushing the rocks with an 8-foot steel bar. The bar came into contact with the rotator and crushed Mr. Buckler's upper spine, causing quadriplegia.

The mine at issue was subject to two inspections per year by federal inspectors from the Mine Safety and Health Administration ("MSHA"). The last inspection occurred in March 2011, and the accident occurred in June 2011. According to Mr. Buckler, a hose that controlled a hydraulic rock clearer on the loading chute had been torn for several years, but no mine inspector had identified this shortcoming as a dangerous condition. Also according to Mr. Buckler, the inspector in March 2011 failed to observe rock crushing operations or maintenance, failed to note missing worker training documentation, and failed to disseminate safety information. Finally, Mr. Buckler emphasizes that, notwithstanding these alleged failures during the March inspection, the mine owner received citations for related safety violations discovered after the June accident. Those citations included a violation of 30 C.F.R. § 48.29 for failing to have training documentation for Mr. Buckler available at the mine site for inspection by MSHA. They also included a violation of 30 C.F.R. § 57.14105 for

failing to de-energize equipment and block it against motion when performing maintenance.

Mr. Buckler sued the government pursuant to the FTCA. The government moved to dismiss under Federal Rule of Civil Procedure 12(b)(1), asserting sovereign immunity and arguing a lack of subject matter jurisdiction. The government argued specifically that there existed no state-law, private-analogue duty under Missouri law and that the discretionary-function exception to the FTCA's waiver of sovereign immunity applied. Regarding the discretionary-function exception, the parties disputed whether the alleged infirmities with the inspection arose from the inspectors' mandatory or discretionary functions. And, to the extent the alleged infirmities arose from discretionary functions, the parties disputed whether that discretion was subject to policy analysis. The district court dismissed the case, finding no state-law duty. The district court did not set forth an analysis of the discretionary-function exception but concluded its order by stating that, for the reasons listed in the government's brief, the discretionary-function exception would also bar recovery.

II.

We review de novo the district court's grant of a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1). See Herden v. United States, 726 F.3d 1042, 1046 (8th Cir. 2013) (en banc). The plaintiff bears "the burden of proving the existence of subject matter jurisdiction," and we may look at materials "outside the pleadings" in conducting our review. Id. (quoting Green Acres Enters., Inc. v. United States, 418 F.3d 852, 856 (8th Cir. 2005)). Because of the "unique nature of the jurisdictional question," Osborn v. United States, 918 F.2d 724, 729 (8th Cir. 1990) (citation omitted), it is the court's duty to "decide the jurisdictional issue, not simply rule that there is or is not enough evidence to have a trial on the issue," id. at 730. As such, if the court's inquiry extends beyond the pleadings, it is not necessary to apply Rule 56 summary judgment standards. Id. at 729. Rather, the court may receive

evidence via "any rational mode of inquiry," and the parties may request an evidentiary hearing." Id. at 730 (quoting Crawford v. United States, 796 F.2d 924, 928 (7th Cir. 1986)). Ultimately, the court must rule upon "the jurisdictional issue [unless it] is 'so bound up with the merits that a full trial on the merits may be necessary to resolve the issue.'" Id. (quoting Crawford, 796 F.2d at 928). "If the [district] court relie[s] . . . on its own determination of disputed factual issues, [we] . . . review those findings under the 'clearly erroneous' standard." Id. (quoting Williamson v. Tucker, 645 F.2d 404, 413 (5th Cir. 1981)).

The FTCA serves as a limited waiver of sovereign immunity, opening the door to state-law liability claims against the federal government for harm caused by government employees. See United States v. Olson, 546 U.S. 43, 44 (2005); Herden, 726 F.3d at 1046. Statutory limitations on this waiver that are material to the present case include: (1) the state-law, private-analogue duty requirement; and (2) the discretionary-function exception. The state-law, private-analogue duty requirement precludes the imposition of FTCA liability based solely on the breach of a federally created duty—if a private person acting in similar circumstances would not be liable under state law for the alleged harm, then there is no FTCA waiver of sovereign immunity. See 28 U.S.C. § 1346(b)(1) (allowing liability "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred"). The discretionary-function exception precludes suit against the government for harm caused by a government employee's acts if those acts are subject to discretion that is "grounded in social, economic, and political policy." Herden, 726 F.3d at 1047–47.

A. State-Law, Private-Analogue Duty

Here, the parties address several possible sources for a state-law, private-analogue duty, focusing primarily on the Good Samaritan Doctrine as adopted in Missouri. See Stanturf v. Sipes, 447 S.W.2d 558, 561–62 (Mo. 1969); Kraus v. Hy-

-4-

Vee, Inc., 147 S.W.3d 907, 925 (Mo. Ct. App. 2004). A key requirement for liability under this doctrine is an increase in the risk of harm based upon the defendant's—the Good Samaritan's—actions. See, e.g., Restatement (Second) of Torts § 323(a) (Am. Law Inst. 1965) ("his failure to exercise such care increases the risk of such harm"); § 324A(a) ("his failure to exercise reasonable care increases the risk of such harm"). The government argues a private inspector who negligently fails to detect or report a dangerous condition does not increase the risk of harm but, at most, allows an existing risk caused by another person to persist. According to Mr. Buckler, however, a Missouri Court of Appeals case demonstrates that an inspector's failure to report a dangerous condition should be viewed as increasing the risk of harm. See Brown v. Michigan Millers Mut. Ins. Co., 665 S.W.2d 630, 636 (Mo. Ct. App. 1984) (holding a private inspector increased the risk of harm by failing to report a dangerous condition regarding the risk of electric sparks in the presence of flammable grain dust). Mr. Buckler argues that Brown demonstrates the Missouri Supreme Court, if faced with the question, would conclude a negligent inspection can give rise to liability under the Good Samaritan Doctrine. See Eubank v. Kansas City Power & Light Co., 626 F.3d 424, 427 (8th Cir. 2010) ("If the Supreme Court of Missouri has not addressed an issue, we must predict how the court would rule, and we follow decisions from the intermediate state courts when they are the best evidence of Missouri law.").

Brown arguably is distinguishable from the present case in several respects. For example, in Brown, an insurer provided the inspector as a means of reducing risk and making insurance more affordable. 665 S.W.2d at 634. Brown, therefore, arguably involved the breach of a contractual duty. Regardless, the court in Brown did not purport to rely on the arguably contractual nature of the duty to inspect. Rather, the Missouri Court of Appeals stated, "Thus, under this theory, there is a factual basis for submission. Defendants, for whatever reason, undertook to inspect for hazards. The evidence unquestionably demonstrates that the existence and use of the plastic pipe was a hazardous condition." Id. at 635. We conclude a qualifying

state-law duty exists because Brown provides the "best evidence" as to how the Missouri Supreme Court would rule if faced with the question of whether an assumed duty to investigate for hazards may give rise to state-law tort liability. Eubank, 626 F.3d at 427.

## B. Discretionary-Function Exception

We use a two-step analysis to determine whether the discretionary-function exception applies. First, we ask "whether the challenged conduct or omission is truly discretionary, that is, whether it involves an element of judgment or choice instead of being 'controlled by mandatory statutes or regulations.'" Herden, 726 F.3d at 1046 (quoting United States v. Gaubert, 499 U.S. 315, 328 (1991)); see also C.R.S. ex rel. D.B.S. v. United States, 11 F.3d 791, 799 (8th Cir. 1993) (noting that the "mandatory" policy directive must be "specific"). If the conduct or omission involves discretion, we next ask "whether the government employee's judgment or choice was 'based on considerations of social, economic, and political policy.'" Herden, 726 F.3d at 1047 (quoting Layton v. United States, 984 F.2d 1496, 1499 (8th Cir. 1993)). Importantly, "as long as a discretionary decision is 'susceptible to policy analysis,'" id. (quoting Gaubert, 499 U.S. at 325), "the exception applies 'whether or not [a] defendant in fact engaged in conscious policy-balancing,'" id. (quoting C.R.S., 11 F.3d at 801). And, if qualifying discretion exists, the exception applies regardless of whether the government employee abuses that discretion. See 28 U.S.C. § 2680(a) (limiting the waiver of sovereign immunity "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, *whether or not the discretion involved be abused*" (emphasis added)). Finally, if discretion exists, a presumption arises that the discretion is grounded in policy considerations, and the plaintiff "must rebut this presumption." Herden, 726 F.3d at 1048 (citation omitted).

i. Discretion

Turning first to the question of whether discretion exists, we note that our circuit has not yet addressed claims against mine inspectors under the FTCA. However, several of our sister circuits have addressed such claims, and in each case, the parties have conceded the existence of discretion or the courts have expressly determined that the inspectors' duties "involve[d] an element of judgment or choice." Herden, 726 F.3d at 1046. In fact, Mr. Buckler cites no case in which a circuit has held MSHA inspectors lack discretion. See Estate of Bernaldes v. United States, 81 F.3d 428, 429 (4th Cir. 1996) (per curiam) (applying the discretionary-function exception and expressly adopting the reasoning of the underlying Virginia district court which held MSHA inspectors possessed discretion rooted in policy considerations (citing 877 F. Supp. 301 (W.D. Va. 1995))); Myers v. United States, 17 F.3d 890, 895 (6th Cir. 1994) ("Even the most cursory glance at the plaintiffs' wording of [MHSA] duties shows that they are replete with choice and, thus, discretion."); Ayala v. United States, 980 F.2d 1342, 1348–50 (10th Cir. 1992) (noting that the parties conceded an MSHA inspector possessed discretion, but holding the particular discretionary action at issue in the case did not involve policy considerations); Russell v. United States, 763 F.2d 786, 787 (10th Cir. 1985) (per curiam) (holding the discretionary-function exception precluded FTCA claims against MSHA inspectors).[1]

---

[1]In addition, two other circuits found discretion existed when addressing FTCA claims against mine inspectors operating pursuant to an earlier mine-safety statute. See Collins v. United States, 783 F.2d 1225, 1230 (5th Cir. 1986) (finding that inspectors possessed discretion because their actions involved choices but holding that their discretion did not involve policy judgments); Hylin v. United States, 755 F.2d 551, 553–54 (7th Cir. 1985) (per curiam) (applying the discretionary-function exception and stating, "The determination whether an 'imminent danger' exists is but the first of several discretionary decisions entrusted to . . . inspectors under the Act").

We also note that a key authority discussed by the parties in this case, a handbook for MSHA inspectors, defines the word "shall" in a non-intuitive manner that reserves discretion for inspectors. Mine Safety & Health Admin., U.S. Dep't of Labor, Handbook No. PH09-IV-1, Metal and Nonmetal General Inspection Procedures Handbook (2009) ("Handbook"). The Handbook's prefatory language states:

> The description of responsibilities that follows set forth the steps that mine inspectors take when conducting mine inspections. When the text describes an action which the inspector "shall" do or otherwise specifies steps which the inspector "shall" perform in some sequence, then the inspector *is to do so consistent with specific conditions at a mine*. Any determination not to conduct such action is to be *based on his or her sound discretion* and that of his or her supervisor. When the action is one that "should" be followed, then the inspector who does them is engaging in best practices for such inspection and should do them consistent with specific conditions at the mine.

Id. (emphasis added).[2]

---

[2] The parties cite little in the way of statutory provisions or regulations that even arguably might be construed as imposing a mandatory and specific duty. Rather, their arguments center primarily on the inspectors' duties as guided by the Handbook and an MSHA Program Policy Manual. See Mine Safety & Health Admin., U.S. Dep't of Labor Program Policy Manual (2003) ("Program Policy Manual"). While such documents are not entitled to deference at the level described in Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 843–44 (1984), they are, nonetheless, afforded "deference" as an agency interpretation of the agency's own regulations. See Andalex Res., Inc. v. MSHA, 792 F.3d 1252, 1258 (10th Cir. 2015) ("Nevertheless, we still afford MSHA's handbook 'great deference'" (quoting Newton v. FAA, 457 F.3d 1133, 1137 (10th Cir. 2006))); but see Kisor v. Wilkie, No. 18-15, 2018 WL 6439837 (U.S. Dec. 10, 2018) (granting cert. as to whether the Supreme Court should overrule authority requiring deference to agency interpretations of agency regulations). In any event, neither Mr. Buckler nor the government challenge the status of the Handbook, nor any other administrative

The Handbook, therefore, expressly recognizes the inspectors' "sound discretion" even as to responsibilities the Handbook states they "shall" perform. This definition arguably is at odds with the general understanding of the term "shall," which courts interpreting the discretionary-function exception often view as demonstrating a government employee's lack of discretion. See, e.g., Metter v. United States, 785 F.3d 1227, 1231 (8th Cir. 2015) (noting that "[t]he use of permissive language, rather than mandatory terms, such as 'must' or 'shall,' shows . . . provisions are merely guidelines"). Moreover, the Handbook recognizes that inspectors' responsibilities will vary depending on the "specific conditions at a mine," suggesting that inspectors must apply professional judgment and common sense when assessing the varied situations they face at all the different mines they inspect. The Handbook and the authority from other circuits, therefore, strongly suggest that MSHA inspectors possess discretion.

Of course, when addressing the existence of discretion, the detailed allegations of the case and the specific duties at issue matter. See Aslakson v. United States, 790 F.2d 688, 691 (8th Cir. 1986) ("The contours of the discretionary function cannot be defined with precision. Thus, each case must be analyzed individually based upon relevant criteria in determining whether the acts of government employees are protected from liability under Section 2680(a)." (citation omitted)); see also Compart's Boar Store, Inc. v. United States, 829 F.3d 600, 605 (8th Cir. 2016) ("Even when some provisions of a policy are mandatory, governmental action remains discretionary if all of the challenged decisions involved an element of judgment or choice." (citation omitted)). Mr. Buckler identifies allegedly mandatory duties that he characterizes as removing choice or discretion from MSHA inspectors: (a) disseminating information about the causes of accidents; (b) inspecting equipment

_____

materials cited herein, as appropriate sources for consideration of the inspectors' duties. Therefore, like the parties themselves, we examine these materials to determine the existence and nature of discretion provided to inspectors.

conditions and inspecting work practices and procedures in all mining cycles; and (c) inspecting training records. We address these alleged duties in turn.

### a. Disseminating Information

Regarding the duty to disseminate information about the causes of accidents, Mr. Buckler cites a provision of the Federal Mine Safety and Health Act of 1977 ("Mine Act") setting forth a broad statement of purpose. See 30 U.S.C. § 813(a) ("[R]epresentatives of the Secretary . . . shall make frequent inspections . . . for the purpose of (1) obtaining, utilizing, and disseminating information relating to health and safety conditions, the causes of accidents, and the causes of diseases and physical impairments originating in such mines . . . ."). This general statutory recitation of purpose does not suffice to articulate a federal employee's specific and mandatory duty. See Metter, 785 F.3d at 1231 (finding discretion where "nothing . . . prescribes 'a specific, mandatory duty'" (citation omitted)). In fact, the statement of purpose, standing alone says nothing about what an MSHA inspector must do and provides no details that might govern and restrict how an MSHA inspector is to carry out inspections. Mr. Buckler relies on a similarly general statement of purpose found in the Handbook. Chapter 1.A of the Handbook states that the purpose of inspections is to "assure that a safe and healthy workplace is provided and maintained for miners" by various means including "by providing information and assistance to the mining industry to aid in reducing and eliminating accidents, injuries, and illnesses in mines or mills." Handbook, at 1. This provision, however, states nothing more specific than the statutory language.

### b. Inspecting Equipment and Observing all Mining Cycles

Regarding the inspection of equipment and the observation of all mining cycles, Mr. Buckler cites various Handbook provisions addressing these inspection targets and reads them together with the inspectors' general duty to "determin[e]

whether an imminent danger exists," 30 U.S.C. § 813(a), and the corresponding duty to issue citations or impose an order to cease activities if an imminent danger is discovered, id. § 814(a).  See also 1 Program Policy Manual § 107(a) (discussing imminent danger orders).  None of the cited provisions, however, remove discretion as to the manner of inspecting equipment or observing mining cycles, nor do the cited provisions dictate how an inspector is to search for "imminent dangers."  These various provisions simply lack the required specificity and mandatory language.  As our court previously has stated, "an agency policy strips government employees of discretion when it 'specifically prescribes a course of action for an employee to follow.'"  C.R.S., 11 F.3d at 799 (quoting Berkovitz v. United States, 486 U.S. 531, 536 (1988)).  "Indeed, to remove discretion, the policy must constitute a 'specific mandatory directive.'"  Id. (quoting Berkovitz, 486 U.S. at 544).

Here, for example, Mr. Buckler cites Handbook Chapter 5.F for the proposition that "[a] regular safety and health inspection of a mine in its entirety includes the following areas, equipment, and documentation: . . . review of work practices and procedures."  Handbook, at 24.  This provision lacks language dictating mandatory steps or demonstrating the elimination of discretion; it simply identifies the target areas for investigation.  See Metter, 785 F.3d at 1231.  He also cites Handbook Chapter 5.G for the proposition that "[i]nspectors shall make every effort to observe each phase of all mining cycles during every regular inspection of a  mine."  Handbook, at 24.  Again, however, the Handbook's use of the term "shall" does not reflect an absence of discretion.  And, even if we were to interpret the phrase "make every effort" as mandating a particular course of action, Chapter 5.G expressly recognizes that not every cycle of a mining operation will be active at the time of an inspector's visit.  As such, inspectors are to exercise discretion to satisfy themselves that their inspection is complete:

> At times, however, inspectors may not be able to observe every mining
> cycle at every working place during a particular inspection.  Given this,

-11-

inspectors must *evaluate sufficient conditions and practices and ask enough questions to be reasonably assured* that work is being safely conducted for the activities that could not be observed.

Id. (emphasis added).

Mr. Buckler appears to argue that mandatory duties exist in relation to these inspection targets in that inspectors must take action in response to "imminent dangers." Such required responses, however, do not remove inspectors' discretion as to the manner in which they carry out their inspection to look for, and determine the existence of, imminent dangers. Instead, required actions following the discovery of an imminent danger are duties flowing from an antecedent determination—a determination necessarily rooted in discretion. See, e.g., Myers, 17 F.3d at 895–96 ("Until that assessment is made, the inspector is not bound by statute or regulation to do anything other than inspect. This . . . presents the MSHA official or inspector with a *choice*; does the condition exist or doesn't it? This choice is sufficient to satisfy the first prong of the [Supreme Court's discretionary-function] analysis." (applying the test of Berkovitz, 486 U.S. at 536 and Gaubert, 499 U.S. at 324)). As such, the MSHA inspectors are charged, first, with assessing conditions at a mine and then, based on that assessment, carrying out functions deemed appropriate and necessary for those conditions. See, e.g., 1 Program Policy Manual § 107(a) (addressing imminent danger orders and stating, "The imminence of danger is a judg[]ment to be made in light of all relevant circumstances. If the violative condition or practice is not an imminent danger, the proper action by the inspector is to issue a citation or order . . . .").

In fact, the inspection at issue in the present case illustrates this discretion well. Mr. Buckler argues a hydraulic line for a rock clearer on the crusher had been torn for years and yet neither the March 2011 inspector nor any previous inspectors had flagged the crusher as an imminent danger. According to Mr. Buckler, the torn line

-12-

should have triggered additional inquiry which would have revealed workers were manually clearing rock jams. Manually clearing rock jams, however, is not necessarily inherently dangerous, much less an "imminent danger," if equipment is de-energized and blocked from movement. An inspector, therefore, must make a choice in reviewing the condition and operation of equipment as to when the inspection is complete and whether follow-up is required. The Handbook provides no specific guidance as to this choice.

### c. Reviewing Worker Training Documentation

Mr. Buckler cites the Mine Act itself and governing regulations that address required training for workers and the maintenance of records to document that training. See 30 U.S.C. § 814 (g)(1); id. § 825(a), (c); 30 C.F.R. §§ 48.7, 48.9, 48.11. Many of these provisions, however, set forth duties for the mine operators rather than for inspectors. See, e.g., 30 U.S.C. § 825(c) ("Upon completion of each training program, *each operator* shall certify, on a form approved by the Secretary, that the miner has received the specified training in each subject area of the approved health and safety training plan. A certificate for each miner *shall be maintained by the operator*, and shall be available for inspection at the mine site, and a copy thereof shall be given to each miner at the completion of such training." (emphasis added)); 30 C.F.R. § 48.9(a) ("[*T*]*he operator* shall record and certify . . . ." (emphasis added)). The mine operators hold the primary responsibility for worker safety; it does not follow that a mandatory duty imposed upon a mine operator creates a mandatory duty for an inspector. See Kane v. United States, 15 F.3d 87, 89 (8th Cir. 1994) ("Courts have protected agency decisions relating to 'the extent to which [an agency] will supervise the safety procedures of private individuals,' because of the impact of those decisions on the 'feasibility and practicality' of a government program with respect to 'staffing and funding' and the 'efficient allocation of agency resources.'" (quoting Kirchmann v. United States, 8 F.3d 1273, 1277–78 (8th Cir. 1993))). Simply put, the fact that the mine operator is required to maintain certain forms and have them

available for inspection, does not mean mine inspectors' review of those documents is strictly dictated in specific terms. As such, we find little authority in the cited provisions for mandatory duties on inspectors.

Even those provisions that do set forth duties for inspectors concerning worker training documentation generally set forth *contingent* duties triggered by antecedent determinations. For example, the Mine Act provides that *if* the Secretary finds a mine employee who has not received "the requisite safety training as determined under section 825 of this Title, the Secretary . . . shall issue an order" declaring the employee to be a "hazard" and requiring the employee to leave the mine. 30 U.S.C. § 814(g)(1). But, as already stated, we may not ignore the discretion associated with the underlying, antecedent determination.

Mr. Buckler correctly argues that at least some level of examination of training records is required; in fact the government concedes this point. The government argues, however, that substantial discretion remains as to how MSHA inspectors carry out such inspections and that MSHA inspectors may exercise discretion to "review" records through an audit or sampling method. In this regard, Handbook Chapter 5.T provides:

> During each regular inspection, inspectors shall review required mine operator and / or contractor documentation regarding mandatory health, training, and safety regulations. Documentation and / or forms which are required to be reviewed and noted by the inspector during every regular inspection include, at a minimum, the items listed on MSHA's inspection (Form 4000-49) forms. Reviews of required on-site documentation should go back to the previous regular inspection conducted by MSHA. . . .
>
> . . . Training records, and injury, illness, and employment reports shall be verified by inspectors by reviewing on-site documentation and

-14-

discussing it with random miners and mine management to assure that this documentation is correct. . . .

Inspectors should also verify that records at the mine or with the contractor match records on file (e.g., legal identity forms, Part 48 training plans) with MSHA. . . .

Handbook, at 37–39.

The argument that this Handbook provision sets forth mandatory, non-discretionary requirements for MSHA inspectors has some superficial appeal. As already noted, however, the Handbook defines the word "shall" as preserving inspector discretion. Moreover, the required worker-training documentation can be voluminous and it may be composite in nature—a single form is not necessarily limited to a worker's completion of a particular training session. See 3 Program Policy Manual § 48.9/48.29 (addressing the use of composite forms rather than individual forms). In short, the number of records that the mine operators are required to maintain and that inspectors "shall review" will, at many mines, be too large to permit individual verification of each record. In this context, we cannot interpret the relatively vague Handbook provision that calls for the "review" of records as eliminating inspector discretion in the manner of review.

ii. Discretion Grounded in or Subject to Policy Analysis

Having determined that the MSHA inspectors possess discretion in relation to the duties that Mr. Buckler challenges, we next examine the nature of that discretion to determine if it is subject to or grounded in policy analysis. See Gaubert, 499 U.S. at 325. Mr. Buckler argues that if discretion exists, it involves no balancing of competing policy interests. According to Mr. Buckler, the sole policy at issue is miner safety and to the extent inspectors exercise discretion, they do so only for technical reasons.

-15-

This characterization vastly oversimplifies the role of the MSHA and presumes unlimited resources for inspectors to deploy at every mine. It also draws false distinctions as between inspectors in the field and policymakers in Washington and as between decisions that are based on technical judgments and those that are based on other considerations. As the defendants point out, the responsibility for miner safety remains at all times with the mine's owners and operators. The MSHA, in deploying inspectors to check on the owners' and operators' compliance, must at all times balance safety against cost. See Metter, 785 F.3d at 1232 (stating that the "Forest Service's 'decision whether or not to issue warnings [was] susceptible to policy analysis [because] it involve[d] balancing safety against cost: the more effort the Forest Service expended to discover dangers and warn contractors of them, the greater the safety benefit but also the greater the cost to the government.'" (quoting Layton v. United States, 984 F.2d 1496, 1504–05 (8th Cir. 1993)))

In carrying out their inspections, MSHA inspectors also must balance technical considerations with conditions on the ground. Moreover, their workloads and responsibilities involve numerous sites. The Supreme Court explained in United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines), that "[d]ecisions as to the manner of enforcing [safety] regulations directly affect the feasibility and practicality of the Government's regulatory program; such decisions require the agency to establish priorities for the accomplishment of its policy objectives by balancing the objectives sought to be obtained against such practical considerations as staffing and funding." 467 U.S. 797, 820 (1984). And those policy considerations are not carried out solely at higher levels of administrative agency authority. Rather, "the fact that [a] decision involved technical or professional judgment at the operational level is not enough to remove [the] decision from the protection of the discretionary function exception." Herden, 726 F.3d at 1048.

Our circuit sitting en banc recently applied the discretionary-function exception in a different context, emphasizing the broad scope of governmental functions that

-16-

the exception is "meant to shield from judicial second-guessing," id. at 1051, including many decisions that require the "exercise[] of professional judgment at the operational level," id. at 1050. Although Herden did not involve MSHA inspectors, it did involve an operational-level government employee carrying out federal policy through the application of technical expertise. There, livestock producers participating in a conservation program relied upon a government agronomist to select a seed mixture for planting on land where cattle would graze. Id. at 1044. Our court concluded the agronomist's selection of a seed mixture was a discretionary decision grounded in policy considerations even though the decisionmaker at issue was a field-level technical specialist guided by a manual that set forth seeding rates. Id. at 1047, 1051. We determined that, in assessing whether the technician's discretion was grounded in or subject to policy considerations, it was inappropriate to rely upon distinctions such as high-level decisionmakers vs. field-level or individual-case-level decisionmakers. Id. at 1048–49. We also determined it was inappropriate to characterize a discretionary decision as not grounded in policy considerations merely because the decision at issue was largely governed by scientific or technical considerations such as what seeds and rates of application are appropriate for given field conditions. Id. In short, our court rejected simple, categorical labels and bright-line rules. We demonstrated unequivocally that the concept of policy considerations is broadly inclusive and sweeps into its folds many seemingly narrow decisions.

In fact, in Herden, the majority contrasted the agronomist's application of specialized technical knowledge in selecting a seed mixture with a psychologist's application of specialized technical knowledge in the treatment of a patient, as had occurred in Lather v. Beadle Cty., 879 F.2d 365, 366–68 (8th Cir. 1989). Our court stated the agronomist's decision was susceptible to policy analysis due to the need to balance competing interests such as reducing soil erosion, improving animal nutrition, and extending the grazing season. Herden, 726 F.3d at 1050. In Lather, in contrast, a treating psychologist was focused singularly on providing healthcare to

-17-

one patient.  879 F.2d at 366–68.  Mr. Buckler seeks to characterize the current inspector's focus as singular, like that of the treating psychologist in <u>Lather</u>.  That situation, however, is easily distinguishable.  Even if a healthcare professional focusing on a single patient can be viewed as pursuing a singular goal, the inspector here is not akin to a healthcare professional focusing on one patient.  The inspector is more akin to a triage nurse or doctor charged with assessing numerous patients, identifying needs and risks, and allocating resources among patients.  Simply put, the inspector at issue in the present case was neither stationed permanently at one mine nor provided with unlimited resources to guarantee safety.

For this reason, our court has repeatedly characterized discretion in the context of safety inspections or safety warnings as susceptible to policy choice due to the need to balance safety against governmental efforts and costs and the need for professionals on the ground to adapt to the conditions they face in determining how to expend limited resources in the efforts to identify dangers.  <u>See</u> <u>Metter</u>, 785 F.3d at 1232 (noting the Corps of Engineers' discretion as to placement of warnings and barriers was subject to policy analysis due to field-level cost-benefit considerations); <u>Demery v. U.S. Dep't of the Interior</u>, 357 F.3d 830, 834 (8th Cir. 2004) (holding that a "[d]ecision . . . whether to warn . . . is susceptible to a policy analysis" due to the need to balance "increased safety . . . with . . . the cost of erecting warnings"); <u>Layton</u>, 984 F.2d at 1504–05 (finding the Forest Service's discretion as to searching out and warning of dangers subject to policy analysis due to field-level cost-benefit considerations).

Finally, in a situation such as this, where the government is merely policing a private actor who ultimately bears the duty to ensure safety, we find it important to respect the rebuttable presumption that the government employee's discretion involves policy choice.  <u>See</u> <u>Herden</u>, 726 F.3d at 1048; <u>see also</u> <u>Gaubert</u>, 499 U.S. at 324 ("When established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion,

-18-

it must be presumed that the agent's acts are grounded in policy when exercising that discretion."). To view the presumption otherwise would confuse the government's duty to *promote* safety with a duty to *ensure* safety. See Varig Airlines, 467 U.S. at 821 ("The FAA has a statutory duty to *promote* safety in air transportation, not to insure it.").

## C. Factual Disputes

In a slight variation on his other arguments, Mr. Buckler argues that the jurisdictional inquiry in this case presents a factual question not appropriate for resolution without a full trial on the merits. He argues the March 2011 inspector falsified records and failed entirely to perform any review of worker training documentation. He also argues such acts fall wholly outside any discretion that might otherwise exist.

Our court has indicated that, even if discretion exists as to the manner in which a government employee carries out an inspection or investigation, the employee may lack discretion to entirely forgo the inspection. For example, we refused to apply the discretionary-function exception where a federal grain inspector entirely failed to conduct an investigation, stating, "[A]lthough the inspector had discretion in selecting how he would investigate the status of previously reported out-of-condition grain, he had no discretion not to undertake some investigation." Appley Bros. v. United States, 164 F.3d 1164, 1172 (8th Cir. 1999). This distinction is consistent with our general recognition that a policy may include some discretionary and some mandatory provisions, and that what matters for our analysis is the nature of the provision material to the challenged decision. See Compart's Boar Store, 829 F.3d at 605.

Parsing a government employee's duties this thinly is confusing to say the least. After all, the FTCA itself provides that the exception is to apply "based upon the exercise or performance or the failure to exercise or perform a discretionary

-19-

function or duty on the part of a federal agency or an employee of the Government, *whether or not the discretion involved be abused.*" 28 U.S.C. § 2680(a). And, failing to conduct an investigation arguably could be described as a simple abuse of discretion. Falsifying records, however, would seem to be more than a mere abuse of discretion. Based upon Appley Brothers, therefore, we believe it is permissible, when analyzing the discretionary-function exception, to recognize that some duties are mandatory in that they must be performed *in some fashion*, even if the manner in which they are performed involves protected discretion. Moreover, the government in the present case concedes that at least some review of worker training documentation was required.

Drawing upon this authority, Mr. Buckler argues that, even if discretion otherwise exists as to the manner in which an MSHA inspector "reviews" training documentation, the inspector is without discretion to entirely forgo such a review. He then argues that the record as currently developed for Rule 12(b)(1) purposes shows the March 2011 inspector conducted no review of worker training documentation. He cites: his own declaration in which he asserts he received no training (and which the government does not dispute); the inspection form completed by the March 2011 inspector on which the inspector indicated he had reviewed six worker training forms; and the fact that the mine employed only six workers who required training. In addition, he cites evidence from the post-accident investigation and citation indicating that Mr. Buckler's records were missing. Finally, he cites deposition testimony from the MSHA's Deputy Administrator for the Metal and Non-Metal program area who described inspectors' duties.

Mr. Buckler notes that the mine was cited for failing to have documentation of training for Mr. Buckler. He cites testimony to the effect that documentation of Mr. Buckler's initial worker training was requested but unavailable. According to Mr. Buckler, this information, read together, shows the March 11 inspector could not have reviewed the forms as claimed and had to have falsified his inspection form when

reporting that he reviewed six worker-training forms. Mr. Buckler argues that, at a minimum, this creates a factual question as to whether the inspector actually conducted any investigation of worker training documentation. Mr. Buckler characterizes this question as a question for trial that cannot be resolved at the current stage. See Osborn, 918 F.2d at 730 (describing the court's ability to resolve factual disputes on Rule 12(b)(1) motions, and stating, "The only exception is in instances when the jurisdictional issue is so bound up with the merits that a full trial on the merits may be necessary to resolve the issue" (citation omitted)).

We conclude that the evidence Mr. Buckler cites suffices, at this early stage in the case, to create a question as to whether the inspector performed any review of training records. Although the inspector possessed discretion as to the manner in which he reviewed documentation, and although it does not matter for purposes of the discretionary-function exception if the inspector acted negligently and sloppily in his investigation, he was wholly without discretion to not conduct at least some review of training materials. Appley Bros., 164 F.3d at 1172. The cumulative effect of the evidence does more than cast a vague suspicion upon the inspector's claims to have reviewed training documents: the government does not contest Buckler's claim that he received no training, the record plainly shows there were no training records for Buckler, and the fact that the inspector claimed to have reviewed six records—the same as the number of employees subject to training requirements—supports the reasonable inference that the inspector falsely claimed to have reviewed records.

We conclude, therefore, that as to the limited question of the inspector's alleged failure to fulfill his mandatory and non-discretionary duty to inspect training records, the jurisdictional inquiry is "so bound up" with the merits of the case as to require further factual development of this threshold jurisdictional question. Osborn, 918 F.2d at 730. At this preliminary stage, we make no comment as to the difficult issue of whether a failure to inspect training records can be shown as a proximate cause of plaintiff's injuries.

-21-

We affirm the judgment of the district court finding no waiver of sovereign immunity and dismissing the case for lack of subject matter jurisdiction in all respects other than the allegations of a failure to inspect training records. As to this limited issue, we reverse and remand to the district court.

_____